Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3722 | **DATE** | 8/14/2001 |
| **CASE TITLE** | Utomi vs. County County | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached order, Cook County's motion for summary judgment is granted (73-1). Judgment is entered in favor of defendant.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | AUG 15 2001 | |
| | Notices mailed by judge's staff. | | date docketed | 84 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| OR | courtroom deputy's initials | 01 AUG 14 PM 4:11 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HELEN UTOMI, DRUNELL DAVIS, )
PAULINE OWUSU & LYNETTE )
COOK, )
 )
    Plaintiffs, )
 )
v. ) Case No. 98 C 3722
 )
COOK COUNTY, owner and operator )
of Cook County Hospital, )
 )
    Defendant. )

AUG 1 5 2001

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Helen Utomi, Drunell Davis, Pauline Owusu, and Lynette Cook are nurses and operating room technicians who claim that their employer, Cook County Hospital, engaged in racial discrimination, racial harassment, disability discrimination, and retaliation. This Court previously dismissed related claims brought by the plaintiffs, including breach of contract, intentional infliction of emotional distress, and defamation. *See Utomi v. Cook County*, No. 98 C 3722, 1999 WL 787480 (N.D. Ill. Sept. 24, 1999). Cook County, the owner and operator of the hospital, now moves for summary judgment on plaintiffs' remaining claims.

### FACTS

Cook County Hospital has provided free medical care to Chicagoans since 1866. The facility operates on a 24-hour basis and must be able to respond to the medical needs of any and all patients rapidly and effectively. Like the city it serves, the hospital's staff is multi-racial, with employees

1

whose ethnicity ranges from Filipino to Korean to Caucasian to Nigerian-born African-Americans. There is no majority race.[1]

The plaintiffs are two nurses (Owusu and Utomi) and two operating room technicians (Cook and Davis), all of whom are African-American. One of their supervisors was a Caucasian woman named Susan Caldwell. Caldwell appears to have been a very blunt person, even rude at times. For example, Utomi had been accused of breaking into another nurse's locker and Utomi went to Caldwell to deny the charges. Caldwell allegedly responded by saying, "This is all bullshit. Will you get out of my office?" At one point, Caldwell stated to Utomi and others that "I don't give a damn about your family, your personal lives, your union." Cook approached Caldwell to ask that her schedule be modified to take account of a class Cook was taking. Caldwell allegedly said, "You liar. How do I know you were in school? I've been lied to before by professionals." On a day when Davis and Utomi had requested help in the operating room but been denied, they had a heated discussion with Caldwell. Caldwell told them that no relief nurses or technicians were available that day. Davis and Utomi continued to complain and Caldwell allegedly shouted "So shoot me!" When Cook missed a meeting, Caldwell confronted her and said, "What's this bullshit about you and Theresa Johnson blowing me off for this meeting about your school schedule?" Utomi stated at her deposition that Caldwell referred to Helen Jones and Utomi as "bitches."

Caldwell made other comments that the plaintiffs claim created a work environment hostile

---

[1] Exhibit 1 to Cook County's Statement of Uncontested Facts is a staff roster for the Main Operating Room as of 12/14/99. Including supervisors, the roster of 123 employees reveals the following ethnic percentages: African-American (44%), Asian (43%), Caucasian (5.6%), Hispanic (4.1%), East Indian (2.4%). More precisely put, the Asian category includes Filipino (32%), Thai (5.6%), Korean (5.6%) and Chinese (0.8%) employees and the African-American category includes 54 employees, five of whom are of African or Caribbean origin.

2

to African-Americans. Caldwell would often begin meetings by saying, "Good morning, ladies and germs," allegedly looking at black males while saying "germs." Caldwell allegedly referred to Cook as a "poor puppy." When a surgical tool was erroneously left inside a patient after an operation, Owusu and a Korean nurse were initially suspended, as they had been responsible for a final count of equipment after the patient was closed up. Shortly after this, another employee told one of the plaintiffs that the employee saw Caldwell dancing in her office and singing, "I have Pauline Owusu now. I got her now." Nurse Coordinator Barley suspended both Owusu and Pak, but she ultimately rescinded both suspensions after the hospital determined that no individual fault could be ascertained. On another occasion, when Owusu showed up to work there was a shortage of scrubs. Caldwell ordered Owusu to go to another floor and get some scrubs, saying that Owusu should find some scrubs "before she starts running around naked." Later, at the morning roll-call, Caldwell made similar remarks, stating that "I see Pauline Owusu finally has some scrubs on. Now she would not show her naked behind anymore." Owusu found this remark racially demeaning, in that it made her feel that Caldwell had "the mindset to believe that Africans are used to nakedness . . . [as seen in] Tarzan movies." Owusu Dep. at 504. It is undisputed that Caldwell apologized for some of these remarks, specifically the "so shoot me" comment and the statement that Owusu would be running around naked without scrubs.

Plaintiffs now allege that Caldwell referred to the black nurses as "niggers." The four plaintiffs never actually heard Caldwell say "nigger." In fact, there is no testimony by any witness who says Caldwell used that word in the witness' presence. Helen Jones stated at her deposition that another employee, Lolita Espanol, told her that Caldwell had said to Espanol before taking her position at the hospital that she was "coming to get rid of all the niggers" in the operating room. But

3

Espanol denied at her deposition that she ever heard Caldwell say that, or that Caldwell ever used the word "nigger" in any other context.

Other, non-black employees were also verbally abused by Caldwell. Pauline Kovich, a white female nurse, stated in her affidavit that Caldwell often called Kovich "stupid" and that Caldwell occasionally raised her voice to her. Another female nurse, Jerelynn Barley, who is African-American, stated in her affidavit that Caldwell was "sometimes rude, frequently abrupt, and had a strict managerial style." Barley noted that Caldwell swore in front of all employees, regardless of their race.

As for race discrimination, the plaintiffs allege that Caldwell manipulated the functioning of the operating room to their detriment. They claim that black nurses were required to work on heavier assignments in the operating room, asked to rotate assignments more often, and denied lunch breaks. They charge further that they were denied overtime and that when the operation room shifted from two 12-hour shifts to three 8-hour shifts Caldwell denied them a special schedule to accommodate their educational schedules. The two nurses, Utomi and Owusu, claim that they were denied charge duty, which is a rotating supervisory position for nurses that entails higher compensation on whatever day the nurse fills that position. Utomi also complains that she was falsely accused of sleeping on the job. In their retaliation claim, plaintiffs contend that Caldwell punished them for complaining to their union and higher-ups at the hospital, such as Linda Strickland, the director of nursing, about harassment and unequal treatment. The plaintiffs assert that they have suffered economic loss because of this discrimination, as well as stress, sleeplessness, nightmares, cold sweats, and physical injuries.

Davis complains further that Caldwell discriminated against her because of a disability.

4

Davis suffers from asthma and chronic lower back pain. She left work for two years, returning in 1997. She alleges that Caldwell "detested" her and placed her on heavy assignments despite her disability.

Caldwell left the employ of Cook County Hospital in 1999 for a job at a hospital in Florida, while the plaintiffs continue to work at the hospital.

## DISCUSSION

At the summary judgment stage, Cook County bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Cook County meets this burden, the plaintiffs must then set forth specific facts and identify the genuine issues of material fact, relying not just on the allegations of their complaint, but also affidavits, depositions, interrogatories, and other documentary evidence produced via the discovery process. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). There are four claims remaining in this case: racial harassment, race discrimination, retaliation, and disability discrimination.

*Racial Harassment Claim*

The plaintiffs' first claim is racial harassment. To be actionable, the allegedly discriminatory conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "This is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). This Court will look to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Id.* at 23. The plaintiff must show that the workplace was both subjectively and objectively hostile. This means that the plaintiffs must have perceived the workplace as racially hostile or abusive, and that a reasonable person would have regarded it as such. *Id.* at 21-22; *Collins v. Village of Woodridge*, 96 F. Supp. 2d 744, 749 (N.D. Ill. 2000).

A reasonable trier of fact could not conclude that Caldwell's statements to the plaintiffs constituted racial harassment that was objectively hostile to African-Americans. Caldwell used profanity and strong language (e.g., "bullshit" and "so shoot me"), but coarse language is not overtly racist as it does not inherently single out and separate members of one racial group from others by suggesting that their race is inferior. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir.) (finding comments such as "dumb motherfucker" not to be racial harassment), *cert. denied*, 528 U.S. 874 (1999). And while it is certainly true that legal grounds for a racial harassment claim can arise from coarse language if it is disparately used against minorities, *id.* at 346, there is no indication that Caldwell was anything but indiscriminate in her selection of targets for verbal abuse. Caldwell often told Pauline Kovich that she was "stupid." Kovich was one of the few other Caucasian employees in the operating room. Jerelynn Barley stated that Caldwell swore at every employee, regardless of race. The Court is aware that such brutish management styles are all too common in American workplaces. That fact is unfortunate, but it does not give rise to a claim under Title VII. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

The plaintiffs seek in vain to portray some of Caldwell's statements as inherently racist and not just coarse language. Specifically, they allege that Caldwell's comment regarding Owusu

6

"running around naked" evinces racist thinking.[2] The Court does not believe that a rational trier of fact could conclude that the comment was racist. It appears to have been a rather poor attempt at humor. Caldwell's description of Cook as a "poor puppy" similarly cannot be found to be racist, particularly given that Caldwell's comment was an attempt to commiserate as she promised to assist Cook. The "ladies and germs" statement harkens back to one of Milton Berle's well-worn lines,[3] the supposed humor of which tends to escape people in this day and age; but however unfortunate the connotations (especially in a hospital), Caldwell's attempt to open a meeting with an icebreaker, however lame, cannot reasonably be considered racist. None of these comments are objectively hostile and therefore cannot be the basis of a racial harassment claim.

Plaintiffs also claim that Caldwell referred to them as "niggers" and that Caldwell vowed to "get rid of all the niggers" in the operating room. But there is no testimony by any witness that Caldwell actually ever said these things. The plaintiffs admit that they never heard any of this from Caldwell, and the one person who allegedly did hear Caldwell use the word "nigger" (Lolita Espanol) flatly denied it in her deposition, see Espanol Dep. at 12 ("No, I did not hear that word."). Even if Espanol were lying about this, the claim is not that Caldwell used the offensive term in the plaintiff's presence, but rather that she said it once to Espanol, who repeated it to Jones, who is not a plaintiff

---

[2] The plaintiffs' argument on racial harassment consists of conclusory accusations that "they were subjected to racial slurs, epithets and other overtly race-related conduct by Caldwell" followed by the statement that "in the interest of brevity of this brief, please refer to the . . . Statement of Contested Facts." This is not helpful to the Court, as it fails to explain how Caldwell's comments are claimed to have been objectively hostile and abusive. And while the Court engaged in a review of the voluminous evidence in this case, we failed to turn up evidence of slurs, epithets, or conduct that a reasonable jury could conclude were objectively hostile to African-Americans.

[3] MILTON BERLE, MILTON BERLE'S PRIVATE JOKE FILE 630 (Crown Pub. 1989) ("Ladies and germs . . . I mean gentlemen!").

7

in this case.

The word "nigger" is objectively hostile and has been the basis, at least in part, for racial harassment verdicts against employers. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991). The test for a hostile work environment articulated by the Supreme Court in *Harris*, however, requires this Court to examine several factors. The first factor is the frequency of the discriminatory conduct, which in this case is very low: once. The severity of the discriminatory conduct is next. "Nigger" is a vile and contemptible racial epithet, especially when spoken with malice, as Caldwell's alleged statement implies. But there is a difference between firsthand knowledge and rumor. In other words, having your supervisor look you in the eye and call you a dirty racial epithet, or use the term when talking to or dealing with others in the workplace, is qualitatively different from hearing from a co-worker that another co-worker said that a particular supervisor, at some time in the past, referred to your race in a deprecating and insulting manner. The next factor is whether the conduct is physically threatening or humiliating, or rather is an offensive utterance. The word "nigger" is certainly humiliating, but it does not by itself imply a threat of physical harm like, for example, the 'KKK' graffiti and hanging of black male effigies in the *Daniels* case. *See id.* at 1274 ("there is no more chilling image than that of a black man being hung by the KKK") (quoting the district court). The final factor is whether the conduct unreasonably interferes with an employee's work performance. It is certainly conceivable that learning second-hand that a supervisor has referred to members of one's race in a derogatory way could unreasonably interfere with an employee's work performance. But plaintiffs offer no evidence that they heard this from anyone during Caldwell's tenure at the hospital. In sum, the Court does not believe that a reasonable jury could find that evidence of later-acquired, third-hand rumors about a single utterance, even of such a vile and

8

reprehensible racial epithet, objectively altered the conditions of the plaintiffs' employment and created an abusive working environment.

The case of *Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 938 (7th Cir. 1996), is somewhat similar to the facts of this case and supports our conclusion. In *Johnson*, the plaintiff had no direct exposure to racially derogatory remarks, but relied on the affidavit of another employee who testified that a supervisor had made disparaging racial remarks about Johnson, as well as other racist remarks made outside Johnson's presence. In addition, Johnson claimed that an "atmosphere of bias and prejudice existed" in the workplace. The Seventh Circuit held that "this evidence is insufficient to support any claim of a racially hostile work environment. We do not have in the record 'the quantity, frequency, and severity' of racial slurs that 'create a work environment so hostile as to discriminate against the minority employee.'" *Id.* (quoting *Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1164 (7th Cir. 1994)). The court noted that "[t]here is no evidence in the record, however, that Mr. Johnson was exposed to any of this racial hostility." *Id.*, n. 8. Similar circumstances exist in this case, where the plaintiffs were not directly confronted with the racial epithet.

The plaintiffs cite to *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668 (7th Cir. 1993), to support their argument that Caldwell's use of the word "nigger" is racial harassment that created a hostile work environment. But in that case, a supervisor called the plaintiff a "nigger" at least twice to his face, *id.* at 675, and another black employee testified at the bench trial that the supervisor had used "nigger" between five and ten times. *Id.* The Seventh Circuit noted that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment [ ] than the use of an unambiguously racial epithet such as 'nigger' by a

9

supervisor in the presence of his subordinates." *Id.* (quotation marks and citation omitted). But *Rodgers* is inapplicable to the facts in this case, as there is no evidence that Caldwell used the word in the presence of the plaintiffs, or that she used it repeatedly. The plaintiffs cite to *Bailey v. Pinyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984), but that case dealt with the direct method of proof in race discrimination, not racial harassment, so the analysis in that case is not relevant. Furthermore, *Bailey* involved facts where a supervisor said to a black employee, "You niggers are all alike." *Id.* at 925. This direct type of verbal abuse is not present in the case before this Court.

The Seventh Circuit has repeatedly suggested as a guideline that hostile work environment claims are actionable when the workplace "is one that is 'hellish.'" *Logan v. Kautex Textron North America*, – F.3d –, No. 00-3128, 2001 WL 856603, *4 (7th Cir. July 30, 2001) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). Based on this record, the Court cannot say that the operating room workplace was "hellish." Summary judgment is granted as to the racial harassment claim.

*Race Discrimination Claim*

The plaintiffs' next claim is race discrimination. Title VII of the Civil Rights Act of 1964 bars employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). Section 1981, originally enacted in 1870 as part of Reconstruction-era legislation, was amended in 1991 to provide that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. §1981(a). The right to make and enforce

10

contracts is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b). The standards and methods of proof for Title VII and §1981 claims are virtually identical, *Von Zuckerstein v. Argonne National Laboratory*, 984 F.2d 1467, 1472 (7th Cir. 1993), so the Court will address them together.

The plaintiffs must offer evidence from which a reasonable jury could find that the hospital discriminated against them because of their race. In addition, the allegedly discriminatory conduct must have resulted in an "adverse employment action," as the law defines that term. *See Russell v. Board of Trustees of the University of Illinois at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001). Some adverse actions, such as termination, are clearly actionable, while others, such as a slight increase in workload, ordinarily are not. "[N]ot everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996), but the test does not require a loss in pay or monetary benefits. *See Haugerud v. Amery School District*, – F.3d. –, No. 00-1911, 2001 WL 869361, *7 (7th Cir. Aug. 2, 2001); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

The plaintiffs allege various claims relating to the management and scheduling of the operating room as part of Caldwell's campaign against black nurses. The specific charges are summarized below:

> 1. Caldwell allegedly took charge duty away from Utomi. Utomi had charge duty scheduled and it was taken away from her. Caldwell also failed to give charges to Utomi and directed that the duty go instead to Marie Kuzniarek, a white nurse. This had an economic effect in that a nurse could receive a 14 dollar differential in pay whenever she was functioning as a charge nurse.
>
> 2. Caldwell allegedly took charge duty away from Owusu. Shin told Owusu that Caldwell had ordered that Owusu's charge duties be given instead to Kuzniarek, despite

11

Owusu's seniority. This had an economic effect in that a nurse could receive a 14 dollar differential in pay whenever she was functioning as a "charge" nurse.

3. Schedules were posted late for the night shift. Caldwell allegedly took over the scheduling in order to disorganize the plaintiffs' lives.

4. Caldwell assigned heavier tasks to the plaintiffs, such as Room F-1, the vascular room, which is a big room to prepare.

5. Overtime requests by the plaintiffs allegedly were denied because of their race. Overtime requests allegedly were never denied to white nurses, such as Marie Kuzniarek. Caldwell allegedly ordered the coordinators to deny overtime to Utomi. This had an economic effect in that the plaintiffs did not receive overtime pay.

6. Involuntary overtime was unfairly distributed, specifically to Utomi.

7. Caldwell asked Jones to watch carefully for any tardiness or absenteeism on the night shift by certain named employees, including Utomi and other blacks.

8. Owusu was falsely charged with sleeping on the job but the charges were dismissed as unsupported.

9. Utomi was accused by a co-worker with breaking into another nurse's locker. No investigation ensued and no charges were brought.

10. Caldwell asked Owusu to go home early on October 22, 1997. Owusu refused, Caldwell was overruled by her director, and Owusu stayed at work.

11. Owusu was ordered to relieve another nurse named McFerian, despite the fact that Owusu was scheduled to be in charge of Gynecology.

12. Owusu was suspended by Nurse Coordinator Barley after a surgical tool was left inside a patient's body. Caldwell allegedly was seen dancing and saying, "I have Pauline Owusu now." The charges were eventually dismissed and the suspension rescinded.

13. Caldwell embarrassed Owusu by saying at a meeting that it was good that Owusu had found some scrubs to wear, so that Owusu wouldn't be running around naked. Caldwell opened other meetings by saying, "Ladies and germs," while looking at black males. Caldwell allegedly used the word "nigger" and vowed to "get rid of the niggers" in the operating room.

14. Caldwell consistently required Owusu to relieve other nurses when Owusu had finished her assignment.

15. Caldwell rotated Owusu into unfamiliar areas, while allegedly no other nurse was similarly rotated.

16. Caldwell required Cook to provide proof of enrollment before Caldwell would accommodate any schedule changes for Cook's education.

17. The hospital changed from two 12-hour shifts to three eight-hour shifts, disturbing the plaintiffs' off-duty class schedule.

The Seventh Circuit recently suggested that there is no actionable adverse action if the plaintiff "has not been disciplined, demoted, or terminated; has not been denied wage or employee benefit increases or been given less opportunity for such increases; and has not had her job responsibilities reduced or been made to perform more menial tasks." *Haugerud*, 2001 WL 869361 at *7. With the possible exception of the allegations relating to charge duty, overtime, the shift change to eight-hour shifts, and Owusu's suspension pending an investigation, none of the plaintiffs' charges rise to the level of an adverse employment action. Posting a schedule late is an inconvenience, not an actionable adverse action. Similarly, requiring the plaintiffs to relieve other employees, rotating them into different specialties, or occasionally assigning them to the largest operating room cannot reasonably be viewed as constituting a constructive demotion, as was the case in the seminal Seventh Circuit case that recognized an adverse employment action despite no reduction in pay: *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987).[4] There is no evidence that

---

[4] As the court stated: "Plaintiff sufficiently established adverse job action here. She was transferred away from a job she enjoyed. She was placed in a new department. . . . Plaintiff was relegated to doing reference work instead of consulting. Plaintiff previously had her own office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant. After her transfer plaintiff was placed at a desk out in the open. She did not have her own office. Her desk was situated just outside her supervisor's office where a receptionist's desk typically would be located. Plaintiff had no telephone at her desk with which she could conduct her business responsibilities. She was not allowed to have business cards printed and she was no longer listed in professional publications as a library consultant." *Collins*, 830 F.2d at 704.

13

Caldwell attempted to discharge or demote the plaintiffs by setting them up with impossible tasks. *See Santelli v. Electro-Motive*, 136 F. Supp. 2d 922, 935 (N.D. Ill. 2001) (finding a transfer to the most difficult work assignment could constitute an adverse employment action). Even if Caldwell asked Jones to enforce the attendance rules with special force on the night shift, nothing substantial ever came from it.[5] The same goes for accusations of sleeping on the job or breaking into lockers; neither charge resulted in discipline of any sort. In fact, Caldwell dismissed out of hand the idea of investigating Utomi for the locker incident. The remarks that were complained about did not constitute racial discrimination for the same reasons we have concluded they did not constitute racial harassment. The plaintiffs allege that Caldwell was rude when she accused Cook of lying about her education and demanded proof of enrollment. But Congress did not enact Title VII to punish employers for that sort of action. "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993).

The remaining allegations that Owusu and Utomi were occasionally denied charge duty and overtime, on the other hand, affected the amount of money that they received. With regard to charge duty, the plaintiffs have not attempted to calculate their loss with any degree of specificity, beyond mentioning that each denial cost them 14 dollars; it appears to the Court, however, that the total loss was quite small. The *de minimus* nature of this financial loss suggests that it should not be

---

[5] Although Cook received a reprimand for tardiness, the plaintiffs have not even attempted to show that the reprimand was a result of Caldwell's order to Jones. It is unclear when Cook was disciplined, specifically if it happened soon after Caldwell's alleged order. Furthermore, a reprimand without any tangible job consequence is not considered materially adverse. *See Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).

14

considered an adverse action. *See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602-03 (7th Cir. 2001) (finding the denial of $156.89 not to be an adverse action); *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000) (holding that loss of $2.89 in overtime pay could not be materially adverse). The plaintiffs complain of a similarly small number of overtime denials that resulted in a loss of overtime pay, but nowhere in their filings to they attempt to total this loss. A vague allegation such as this might suffice at the motion to dismiss stage (as this Court found in a prior Opinion, 1999 WL 787480 at *3), but the plaintiffs must do more if they are to defeat a motion for summary judgment.

Even if the denial of overtime or denial of charge duty rose to the level of an actionable adverse employment action, the plaintiffs would not be able to show that similarly situated non-African-American nurses were treated more favorably. The record establishes that Utomi and Owusu were assigned charge duty numerous times, just like nurses of every other race. Furthermore, it is undisputed that nurse coordinators, not Caldwell, scheduled charge duty, so any disparity in scheduling would have to result from the discriminatory decision of a nurse coordinator, something that the plaintiffs have neither alleged nor argued. As for overtime, Pauline Kovich, a Caucasian nurse, stated that she was often denied overtime, and the record reveals that Owusu and Utomi worked far more overtime hours in 1997 and 1998 than three other Caucasian nurses, suggesting that any denial of overtime had little or no effect on Owusu's and Utomi's overall opportunity to work overtime and receive the concomitant pay hike.

As for the move to eight-hour shifts, while it certainly affected the plaintiffs' employment, the shift applied throughout the operating room and therefore cannot be considered discriminatory in any way. The law did not require the hospital to accommodate plaintiffs' class schedules, and there is no evidence that such accommodations were made in a racially discriminatory basis. With

15

regard to Owusu's suspension, it arose from a hysterectomy operation after which Owusu conducted a post-operation instrument count and a certain Nurse Pak signed off on the form. Later, complications arose in the patient, and it was discovered that a surgical instrument had been left inside the patient's body. Nurse Coordinator Barley, who is African-American, suspended Owusu for five days and Pak for three days, pending an investigation. Caldwell was not involved with the decision to suspend the nurses. Ultimately, an investigation failed to determine who was at fault, the suspensions were rescinded, and any charges of misconduct were dismissed. Even assuming that a rescinded suspension constitutes a materially adverse employment action, which we do not, Owusu has no evidence that these actions were taken because of intentional racial discrimination. Specifically, Owusu has not introduced any evidence to suggest that Barley made statements that reflect a propensity to evaluate employees based on illegal criteria, so she cannot succeed under the direct method of proof. Under the indirect method of proof, Owusu must show that similarly situated, non-African employees were treated more favorably. *Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001 (7th Cir. 2000). While it is true that Nurse Pak, who is Korean-American, received a three-day suspension, while Owusu got five days, the difference is negligible, and both suspensions were ultimately rescinded.

In sum, summary judgment is appropriate for the race discrimination claims under §1981 and §2000e-2(a)(1), as most of the allegedly discriminatory actions do not constitute adverse employment actions, and a trier of fact could not reasonably conclude that the occasional denial of overtime or charge duty, the schedule change to an eight-hour schedule, or the suspension of Owusu were motivated by intentional racial discrimination.

*Retaliation*

The plaintiffs wrote several letters to Linda Strickland, the director of nursing, and filed grievances with their union, complaining of harassment and unfair treatment by Caldwell. They also allegedly wrote to John Stroger, the president of Cook County Hospital, but the record does not contain a copy of this letter. To establish a prima facie case of retaliation, the plaintiffs must provide evidence that (1) they engaged in statutorily protected expression, (2) they suffered an adverse action, and (3) there is a causal link between the protected expression and the adverse action. *Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1459 (7th Cir. 1995); *Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999). Assuming that these letters constitute protected expression, the plaintiffs' retaliation claim can be viable only with regard to those adverse employment actions identified earlier: specifically, the occasional denial of overtime and charge duty, the schedule change, and the five-day suspension of Owusu pending an investigation. None of the other allegedly discriminatory acts constituted adverse actions.

With regard to the denial of overtime, the plaintiffs have not pointed to particular dates when they complained and were allegedly denied overtime, but it appears from the Court's search of the record that Utomi requested overtime on May 22, 1997, and was denied overtime by Nurse Coordinator Sylvia Shin, allegedly on orders from Caldwell. The record is somewhat unclear, but the plaintiffs' grievances with their union and letters to Strickland began much later, in September and November 1997, thereby negating any claim of retaliation.

The dates of charge duty denials are also somewhat vaguely sketched out in the plaintiffs' response brief, but Utomi appears to allege a denial on June 22, 1997. Just as with overtime denials, this allegedly retaliatory act occurred before any complaints that are in the record and no causation

17

can be shown. With regard to Owusu's suspension, plaintiffs have provided no evidence of a nexus between a complaint about Caldwell and the action by Barley. Summary judgment is appropriate on the retaliation claim.

*Davis' Discrimination Claim*

To establish disability discrimination, Davis must show that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job either with or without reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability. *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). As explained above, no adverse employment action was taken against Davis. She does not allege any loss of overtime and, as an operating room technician, she was ineligible for charge duty. Even if such adverse action had been taken, Davis would not be able to show that she is disabled as the ADA defines that term. Congress defined "disability" in the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. §12102(2)(A). Davis argues that she is substantially limited in the major life activity of working, but she makes no attempt to meet the requirements of establishing a claim under that category. The term 'substantially limits' has been defined by regulation as meaning that the employee is:

> (1)(i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
>
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term

impact of or resulting from the impairment.

29 C.F.R. §1630.2(j). Being substantially limited in the major life activity of working requires that the plaintiff be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* §1630.2(j)(3)(i). The impairment must substantially limit employment generally. *Patterson v. Chicago Association for Retarded Citizens*, 150 F.3d 719, 724-25 (7th Cir. 1998). Davis has the burden of presenting evidence to identify how her impairment limited an entire class or broad range of jobs. *Sinkler v. Midwest Property Management Ltd. Partnership*, 209 F.3d 678, 685 (7th Cir. 2000). This burden is not an onerous one, *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 507 (7th Cir. 1998), and this court must engage in an individualized analysis of Davis' disability, qualifications, and work history. *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 672 (7th Cir. 1998) (citing *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995)).

Davis has not introduced evidence from which a reasonable jury could conclude that she is substantially limited in the major life activity of working. Her doctor's report released her without any work limitations, and she has provided no contrary evidence, medical or otherwise. Summary judgment is appropriate on Davis' disability discrimination claim.

## CONCLUSION

For the reasons stated above, Cook County's motion for summary judgment [73-1] is granted. The Clerk is directed to enter judgment in favor of the defendant.

Dated: August 14, 2001

MATTHEW F. KENNELLY
United States District Judge

19